*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JOHNNEY RAY WATKINS,

        Defendant-Appellant.

UNPUBLISHED
July 21, 2026
10:26 AM

No. 374915
Oakland Circuit Court
LC No. 2024-289285-FH

Before: MALDONADO, P.J., and RIORDAN and YOUNG, JJ.

PER CURIAM.

Defendant, Johnney Ray Watkins, appeals as of right his November 13, 2024 convictions for mayhem, discharge of a firearm in a building, felony firearm, felon in possession of a firearm, felonious assault, and domestic violence. On appeal, Watkins argues that (1) his Sixth Amendment right to confrontation was violated when the trial court admitted preliminary examination testimony of the complainant at trial, and that (2) defense counsel was ineffective for failing to communicate a plea offer to Watkins prior to trial. Watkins requests a new trial or, alternatively, that this Court remand the case for a *Ginther*[1] hearing on his ineffective assistance of counsel claim. We agree in part with Watkins' arguments and remand the case to the trial court for a *Ginther* hearing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

**Underlying Offense**

This case stems from a March 1, 2024 incident of domestic violence between Watkins and his mother, Kelley Burks. According to Burks, on the date of the offense, Watkins and the mother of his child, Destiny, were living part-time in Burks' home with Burks, her youngest son, and youngest daughter. While Watkins was living in Burks' home, it was his responsibility to make sure Burks' son got to school on time. That morning, Burks got a notification from her son's

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

school that he was absent or tardy. Burks confronted Watkins about the notification, and the confrontation quickly turned into a "heated argument." The two got into "a screaming match" where they "kind of got into each other's face" and Watkins bit Burks' cheek. They continued arguing until Burks told Watkins, "it's time to go." Watkins went upstairs to pack up his belongings with Destiny. Burks thought they "were taking too long" to pack up, so she went upstairs to tell them to hurry up. Burks and Watkins got into another argument and Watkins bit her face again, this time on her mouth. Her lip was torn and bleeding.

Burks testified that she then went downstairs to get her phone to call 911 and grabbed a kitchen steak knife to defend herself. Watkins came back downstairs and Burks saw that he had a gun in his hand. Burks recalled that she "probably" threatened Watkins with the knife while they continued to argue. Watkins pointed his gun at Burks, then pointed it straight down and shot into the floor. Watkins took Burks' phone so she could not call the police. Burks grabbed her daughter's phone and called 911. By the time the police arrived, Watkins and Destiny were gone.

**Burks' 911 Call And Police Response**

Dispatcher Adria McCray later testified at trial that she received the 911 call from Burks following the incident with Watkins. Burks told McCray that she and her son had gotten into physical altercation, that her mouth was "messed up real bad," because he bit her lip and cheek, and that she needed an ambulance to take her to the hospital because she did not have a car. She gave dispatch the address and also indicated that she wanted to press charges against Watkins. Burks warned that Watkins was armed, that he had fired a bullet into the floor of her home and that the casing was still on the floor, and that Watkins left in a Chevy Malibu. Burks provided her name, as well as the first and last name and birth date of her son.

Trooper Patrick Baldwin of the Michigan State Police responded to the scene and later testified at trial. Baldwin observed the injuries that Burks reported to 911, specifically that her lip was bleeding and "[a] large section of it was hanging off." He also observed a bullet casing on the living room floor, but did not see a bullet hole. Baldwin spoke with Burks as well as her daughter Marianna, who had observed the altercation with Watkins. EMS took Burks to the hospital.

Baldwin tried to locate Watkins. Baldwin called Watkins and left a voicemail explaining who he is and that he "needed to speak to [Watkins] about the incident[.]" Baldwin had Destiny's address, so he drove to her house, but neither Watkins nor Destiny were there. Watkins' driving record revealed that he had recently been pulled over in the same vehicle that he left Burks' home in, and that vehicle was registered to Destiny. Baldwin put a Law Enforcement Information Network (LEIN) message out to other officers as well so they would know police were looking for Watkins if he was pulled over. The LEIN database also revealed that there were no guns registered to Watkins or Destiny.

Five days later, Baldwin returned to Burks' home. This time, Burks found and showed Baldwin the bullet hole, which was in the furnace. Baldwin found "the majority of the bullet slug" on the basement floor and took it as evidence. Burks gave a written statement at this time. Watkins was ultimately charged in connection with these events.

## Burks Testifies At The Preliminary Examination

A preliminary examination took place on May 29, 2024.  Burks was the only witness, and she testified as provided above.

## Watkins Is Not Present For His Final Pretrial Hearing

Watkins' pretrial hearing took place on November 7, 2024.  The prosecutor and defense counsel both attended, but Watkins did not.  Defense counsel stated that the week before, the prosecutor called him with a plea offer and that he had "been relating that offer back and forth [to Watkins].  The only issue was we didn't know which plea was going to be as to what.  But there was an offer" of one year in the county jail.  After several unanswered calls, Watkins returned defense counsel's call and according to defense counsel, Watkins told him that "he wants to accept the offer."  Defense counsel also told Watkins during that conversation about the final pretrial hearing.

Since that conversation, trial counsel had been unable to reach Watkins.  He stated that Watkins' phone number was no longer operable and that Watkins was not answering his email.  Defense counsel stated, Watkins had been "given a gift, and he's not availing himself to that."  The court replied that "sometimes people are given gifts, and they just don't accept them" and noted that Watkins also failed to enroll with pretrial supervision.  The court forfeited Watkins' bond and issued a bench warrant.  Watkins' jury trial was set to continue as scheduled.

## Watkins' Request For New Counsel

Watkins' jury trial began on November 12, 2024.  Before trial began or the jury was brought in, defense counsel stated that Watkins was requesting new counsel.  The court replied,

> No.  That's not going to happen.  No, not on the day of trial.  This case has been out there, and if you were dissatisfied, you should have contacted the Court long before now.  This case is from May.  No.

Defense counsel asked if Watkins could make a statement in response, which the court allowed. Watkins stated,

> . . . I only asked for a new attorney because I wasn't informed there was a court date last week – like – or a couple days ago about me supposed to be signing a plea. I was informed yesterday I was supposed to take a plea or like some kind of deal that they had about separating a case – from – from the case that I'm fighting right now.  So, it's like – I just wanted to ask can I get a new one.  'Cause he never informed me and let me know that I was supposed to come to a court date last week.
>
> All I was informed that I had a trial.  I never had – was informed that I had a new court date coming or supposedly a pop-up court date.  He – I don't have no voicemails, no e-mail, no mail, no nothing pertaining to me coming to a court date last week that he said I – I have a warrant out for my arrest or something now.  I never was informed, Your Honor[.]

> That's – that's why I'm asking for a new attorney because I feel like he's not representing me right. 'Cause I was supposed to be informed of that. Yes, he called me. Yes, we had a conversation about that we were supposed to take a – deal with the County – with the prosecutor.

Watkins also stated that he never changed his number and did not have any issues with his phone.

Defense counsel responded by explaining the difficulty he had in contacting Watkins. According to defense counsel, Watkins has three or four phones and he "left messages somewhere." The trial court noted that "[defense counsel] attempted to contact [Watkins]. He contacted [Destiny]" and that defense counsel can only do "so much if [Watkins] do[es]n't keep in touch with him also." The court denied Watkins' request for a new attorney.

## Due Diligence Hearing And Watkins' Jury Trial

Before proceeding with trial, the prosecution informed the court of another issue—that Burks was unavailable to testify at trial. The prosecution requested that the court find due diligence was made by the prosecution to locate Burks, and to therefore admit Burks' testimony from the preliminary examination hearing at trial. The court heard testimony from three witnesses on this issue.

First, Baldwin testified that he attempted to serve Burks with a subpoena at her home on three different dates during the morning or afternoon. He went in a marked police car each time. Burks was never home. During the first attempt, Baldwin spoke with Burks' youngest son, who told him that Marianna was home. When Baldwin asked the son to go get Marianna, he stepped away for a few minutes before returning to tell Baldwin that Marianna was actually not home. Baldwin told the son to have Burks call him, but she never did. Baldwin also called Burks and Marianna's phones each time after attempting in person service, but neither answered. He left voicemails on Burks' phone.

Trooper Corinthian Gray next testified on the due diligence issue. Gray attempted to serve Burks with a subpoena once at her home during the morning time, but no one answered the door. Gray was wearing a police uniform and driving a marked police car.

The final witness to testify regarding due diligence was Lawrence Novak, investigator for the Oakland County Prosecutor's Office. At the prosecutor's request, Novak agreed to help locate Burks so that she could be served with a subpoena. Novak confirmed Burks' full name, current address, phone number, and registered vehicles through the LEIN and the Secretary of State systems. He called the phone number that was listed, but no one answered. Novak used an additional law enforcement database to run Burks' information, which provided a different phone number associated with Burks and an email address. Novak emailed the address provided, but no one responded.

Novak attempted to serve Burks at her home on three different dates. The first time, there were no cars in the driveway or outside the home. Novak left his business card and a copy of the subpoena "inside the door . . . wedged . . . in next to the door handle" so that if anyone was "going

in the house, they would have to see that first." The second time Novak attempted service at Burks' home, he noticed an SUV in front of the house with its windows down. He approached the home, and the door was slightly ajar—but again, no one answered. Novak called Burks' phone that day as well and left a voicemail. Novak used the law enforcement database to find the names, addresses, and phone numbers of Burks' family members. He tried reaching out to about six of them, but no one answered his calls. Novak left voicemails for a couple of the family members but did not get any responses. A few days later, Novak made his third and final attempt to serve Burks at her home. No cars were in the driveway or out front and no one answered the door. Novak saw one of Burks' neighbors and asked him if he had seen Burks; the neighbor said "he hadn't seen her in awhile."

Following this testimony, the trial court found that the evidence showed Burks was evading her subpoena and that due diligence to locate her had been shown. The court granted the prosecution's request to admit Burks' preliminary examination transcript into evidence at trial.

The case proceeded to trial. McCray and Baldwin testified as provided above and Burks' preliminary examination testimony was presented. The jury found Watkins guilty of one count of mayhem (MCL 750.397), one count of discharge of a firearm in a building (MCL 750.239), one count of possession of a firearm by a prohibited person (MCL 750.224f(6)), one count of felonious assault (MCL 750.82), two counts of possession of a firearm in the commission of a felony (MCL 750.227b), and one count of domestic violence second offense (MCL 750.813).

## Sentencing

At sentencing, Watkins again stated that defense counsel failed to communicate the prosecution's plea offer to him prior to trial:

> Um, I would like to say – I would like to put things on the record for appeal purposes for starter. ***A plea deal was given to me that I wasn't aware of after – before my trial date.*** I let you know that during – before trial. After my court date, I have a – I have a case right here ready to present. But [defense counsel] has done these before it and not came forward and let somebody know that a plea deal was offered.
>
> I got three kids, one on the way. I just – I apologize to my family. I just want to do better. I'm – I'm just changed, you know, but I'm just not takin' what my lawyer did lightly, ***and I had a deal on the table for something that he didn't let me know***. I was actually aware. ***He just literally told me today in a in the back that I was supposed to get*** – what I was supposed to get and what I was taking. ***He never told me this before my trial or none of this***. And I'm – I'm just not taking that lightly at all 'cause it's my life that's in his hands.

Watkins was sentenced to 58 months to 15 years for mayhem and discharge of a firearm, 28 months to 7 years for possession of a firearm by a prohibited person, 1 to 6 years for felonious assault, 2 years for each felony firearm conviction, and 187 days in jail for domestic violence second offense. This appeal followed.

## II.  SIXTH AMENDMENT RIGHT TO CONFRONTATION

Watkins argues on appeal that his constitutional right to confront the witnesses against him was violated when the trial court admitted Burks' preliminary examination testimony.  We disagree.

### A.  STANDARD OF REVIEW

We review a trial court's determination as to whether the prosecution exercised due diligence in locating a witness for an abuse of discretion.  *People v Bean*, 457 Mich 677, 684; 580 NW2d 390 (1998).  A court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes or when it makes an error of law.  *People v Duncan*, 494 Mich 713, 722–723; 835 NW2d 399 (2013).  Questions of constitutional law, including those regarding the Sixth Amendment's Confrontation Clause, are reviewed de novo.  *People v Buie*, 491 Mich 294, 304; 817 NW2d 33 (2012).

### B.  THE TRIAL COURT DID NOT VIOLATE WATKINS' SIXTH AMENDMENT RIGHTS BY ADMITTING BURKS' PRELIMINARY EXAMINATION TESTIMONY

"A defendant has a right to be confronted with the witnesses against him or her."  *People v Chambers*, 277 Mich App 1, 10; 742 NW2d 610 (2007), citing US Const, Am VI; Const 1963, art I, § 20; *Crawford v Washington*, 541 US 36, 42; 124 S Ct 1354; 158 L Ed 2d 177 (2004) ("the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.").  "A witness is considered unavailable if he or she is 'absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means, and in a criminal case, due diligence is shown.' " *People v Yost*, 278 Mich App 341, 370; 749 NW2d 753 (2008), quoting MRE 804(a)(5).  However, "a witness is not 'unavailable' for purposes of the . . . confrontation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial."  *Hardy v Cross*, 565 US 65, 69; 132 S Ct 490; 181 L Ed 2d 468 (2011) (quotation marks and citation omitted).  The test to determine whether a witness is unavailable "is one of reasonableness and depends on the facts and circumstances of each case, i.e., whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it."  *Bean*, 457 Mich at 684.  "[W]hen a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence . . . but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising."  *Hardy*, 565 US at 71-72.

The record shows that several people attempted to locate Burks to serve a subpoena in person, via phone and email, and even through other family members, on multiple occasions.  First, Baldwin testified that he went to Burks' home in a marked police car on three separate dates in the morning or afternoon to serve the subpoena.  During the first visit, he spoke with Burks' son, who initially said Marianna was home, but then told Baldwin that she was actually not home.  Baldwin asked the son to have Burks call him, but she never did.  Baldwin also called Burks' and Marianna's phones on all three dates that he attempted service; he left voicemail messages on Burks' phone each time, but Marianna's phone did not accept voicemails.  Gray next testified that

he tried serving Burks once at her home during the morning time, but no one answered the door. Gray was wearing a police uniform and driving a marked police car at the time.

Novak testified that he ran Burks' name through the LEIN and Secretary of State network to confirm her contact information and called the phone number listed on the police report for this incident. Novak emailed Burks as well, but she never answered. Novak went to Burks' home on three different occasions in the morning or afternoon to try to serve her, but no one answered the door. On the first occasion, Novak left his business card with the subpoena in the door so that anyone going through it would see them. On the second occasion, Novak noticed the business card and subpoena were gone. He knocked on the front door, which was slightly ajar, but no one answered. He also tried calling Burks on this second occasion and left her a voicemail. On Novak's third attempt to serve Burks at her home, no one answered the door. Novak spoke with a neighbor who said that he had not seen Burks in a while.

We agree with the trial court that these aforementioned attempts show that due diligence was exercised in attempting to obtain Burks as a witness for trial. See *People v Eccles*, 260 Mich App 379, 391; 677 NW2d 76 (2004) ("[D]ue diligence is the attempt to do everything reasonable, not everything possible, to obtain the presence of a witness") (citation omitted); *People v Briseno*, 211 Mich App 11, 16; 535 NW2d 559 (1995) (noting that the prosecution is not required to exhaust all avenues for locating a witness, but has a duty only to exercise a reasonable, good-faith effort to locate the witness). On the record before us, we cannot say that the trial court erred by concluding that the prosecution exercised due diligence in attempting to locate and produce Burks for trial and by correspondingly concluding that she was an unavailable witness under MRE 804(a)(5).

Furthermore, the admission of Burks' preliminary examination testimony did not violate Watkins' right to confront the witnesses against him, because defense counsel had the same motive when cross-examining Burks at the preliminary examination as he would have had at trial. While Watkins' briefing on this issue is underdeveloped, we note that this court has repeatedly rejected the argument that just because there may be different stakes or strategic decisions involved at the preliminary examination stage versus trial, preliminary examination testimony is per se inadmissible at trial under MRE 804(b)(1) or the Confrontation Clause. See, e.g., *People v Garay*, 320 Mich App 29, 37-39, 903 NW2d 883 (2017), rev'd in part on other grounds by 506 Mich 936, 949 NW2d 673 (2020); *People v Wood*, 307 Mich App 485, 517-518, 862 NW2d 7 (2014), rev'd in part on other grounds by 498 Mich 914, 871 NW2d 154 (2015); *People v Garland*, 286 Mich App 1, 7, 777 NW2d 732 (2009); *People v Adams*, 233 Mich App 652, 659-660, 592 NW2d 794 (1999).

Watkins' preliminary examination involved the same offenses for which he was later tried, and his fundamental interest at the preliminary examination was the same as at trial. Defense counsel questioned Burks about the facts and timeline regarding the underlying offense and specifically asked questions that suggested Burks was the aggressor in the altercation and that Watkins was trying to leave the home when Burks armed herself with a knife. We see no basis to conclude that Watkins lacked the opportunity or a sufficiently similar motive to conduct cross-examination of Burks.

We find no abuse of discretion in the trial court's decision to admit Burks' preliminary examination testimony at trial.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Watkins next argues that defense counsel was ineffective by failing to communicate a plea offer from the prosecution prior to trial. Because we believe further factual development is required to resolve Watkins' claim, we remand this case to the trial court for a *Ginther* hearing.

### A. STANDARD OF REVIEW

A claim of ineffective assistance of counsel "is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). When reviewing an ineffective assistance of counsel claim, this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of law. *Id*. The trial court's findings are clearly erroneous if this Court is left with a definite and firm conviction that the trial court made a mistake. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012).

### B. FURTHER FACTUAL DEVELOPMENT IS REQUIRED TO DETERMINE WHETHER A PLEA OFFER WAS COMMUNICATED TO WATKINS

Defendants have a constitutional right to the assistance of counsel for their defense in all criminal prosecutions. See US Const, Am VI; Const 1963, art 1, § 20. "An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair. For that reason, the Court has recognized that 'the right to counsel is the right to the effective assistance of counsel.' " *Strickland v Washington*, 466 US 668, 685-686; 104 S Ct 2052; 80 L Ed 2d 674 (1984) (citations omitted). To establish that defense counsel was ineffective, a defendant must demonstrate that "(1) counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *Id.* Because both prongs must be satisfied to establish ineffective assistance of counsel, if a defendant cannot satisfy one prong, the other need not be considered. *Id*. at 697. "In examining whether defense counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that counsel's performance was born from a sound trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012).

The law is clear that the plea negotiation process is a "critical stage" of a criminal proceeding where the right to effective counsel is paramount. *Missouri v Frye*, 566 US 134, 144; 132 S Ct 1399; 182 L Ed 2d 379 (2012). Counsel "has the duty to communicate formal plea offers from the prosecution[.]" *Id*. at 145. A "defendant has the burden of proving by a preponderance of the evidence that a plea offer was made and that his counsel failed to communicate it to him." *People v Williams*, 171 Mich App 234, 242; 429 NW2d 649, 652 (1988). The "failure to convey a plea bargain offer may constitute ineffective assistance of counsel[.]" *People v Todd*, 186 Mich App 625, 635; 465 NW2d 380, 386 (1990). Moreover, "[w]hen a defendant asserts that his assigned lawyer is not adequate or diligent or asserts . . . that his lawyer is disinterested, the judge should hear his claim and, if there is a factual dispute, take testimony and state his findings and conclusion." *Ginther*, 390 Mich at 442-443.

At the start of trial, Watkins requested new counsel because he "fe[lt] like [defense counsel was] not representing [him] right." Watkins elaborated, specifically complaining that the

prosecution's plea offer was not clearly communicated to him and that defense counsel did not tell Watkins that he had to appear the week before for the November 7 final pretrial hearing. The court asked Watkins and defense counsel some questions regarding their pretrial communications and whether the plea offer made by the prosecution was communicated, but neither Watkins nor defense counsel were under oath at this time. Based on the limited record before us, it is unclear whether any plea offer was communicated to Watkins prior to trial. Watkins' explanation of what transpired is seemingly inconsistent, with him claiming "I wasn't informed . . . about me signing a plea" but then responding "yes," when the Court asked if the prosecution made a plea offer. At sentencing, Watkins again stated that a "plea deal was given to me that I wasn't aware of" and that defense counsel "just literally told [Watkins on the day of sentencing] . . . what [Watkins] was supposed to get."

Defense counsel's explanation of what happened is contradictory, but equally confusing. At some point, defense counsel asserted that "the only way [he] was able to get a hold of [Watkins] was through his girlfriend[,] but it remains unclear as to whether or when defense counsel actually spoke to Watkins (and communicated the plea offer) or if he merely spoke to Destiny, who was apparently tasked with communicating between Watkins and defense counsel. Defense counsel even stated at the November 7 pretrial hearing that Watkins had *accepted* an offer, but Watkins was not present at that time and ultimately went to trial. On the date of trial, when Watkins offered the trial court some proof of his communications, or lack thereof, with defense counsel, the trial court instead brought out the jury.

To establish his ineffective assistance of counsel claim, Watkins must demonstrate that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. At this juncture, the record reflects a factual dispute between Watkins and his counsel. Without resolution of that factual dispute, we are unable to determine whether counsel's pretrial performance was deficient. As for the second prong of our ineffective assistance of counsel analysis—whether there is a reasonable probability that, but for defense counsel's deficiency, the result of the proceedings would have been different—it seems that Watkins would have accepted a plea offer but it is not clear if one was communicated.[2] With a factual dispute of this import, the trial court should "hear [Watkins'] claim and . . . take testimony and state [its] findings and conclusion." *Ginther*, 390 Mich at 442-443.

Accordingly, we remand this case to the trial court to hold a *Ginther* hearing on Wakins' ineffective assistance of counsel claim. We do not retain jurisdiction.

/s/ Allie Greenleaf Maldonado
/s/ Michael J. Riordan
/s/ Adrienne N. Young

---

[2] Defense counsel stated at the final pretrial hearing that, "[Watkins] wants to accept the offer." and Watkins stated at trial that "we had a conversation about that we were supposed to take a – deal with the County – with the prosecutor."